**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LARISSA PERRY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 19-17899 (FLW) (TJB) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHELLE LEE, MARANDA ODJIDJA, | : | |
| WELLS FARGO BANK, N.A., | : | |
| JANE DOE and RICHARD ROE, | : | |
| fictitiously named defendants, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, Chief Judge:**

Plaintiff Larissa Perry ("Plaintiff")[1] has filed an Amended Complaint against Defendants

Wells Fargo Bank, N.A., Michelle Lee, and MaRanda Odjidja (collectively "Defendants"),

bringing claims of breach of contract, conversion, false light, and tortious interference, and

alleging violations of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat.

Ann. § 34:19-1, *et seq.*; and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat.

Ann. § 10:5-12.  Presently before the Court is Defendants' Motion to Dismiss the Amended

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below,

Defendants' Motion is **GRANTED**.  Plaintiff's claims are dismissed without prejudice; Plaintiff

---

[1]     Plaintiff's initial Complaint included three other plaintiffs—Steven Cook, Louis Cardace, and Loredana Nadasan-Cano.  (*See* Notice of Removal, Ex. A, at 1.)  However, the Amended Complaint does not name any of these plaintiffs.  Accordingly, the Court will direct the Clerk to terminate these plaintiffs from the docket.  The initial Complaint similarly named additional defendants—Carlos Arroyo and Andrea Lee—who are not named as defendants in the Amended Complaint.  The Clerk will similarly be directed to terminate these defendants.

is given leave to file an amended complaint with respect to her contract claims and her CEPA claim.  To the extent discovery reveals additional evidence to support Plaintiff's other claims, she may file a motion to amend those claims.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this Motion to Dismiss, the Court takes as true all allegations of the Amended Complaint.  Plaintiff worked for Wells Fargo from 1992, when she was hired as a branch manager, to March 2019 when she was terminated.  (Am. Compl. ¶ 1.)  Relevant to this action, in January 2015, Plaintiff was promoted to lead Region President.  (*Id.* ¶¶ 1, 5.)  Plaintiff's direct supervisor in this position was Lee.  (*Id.*)

In June 2015, Plaintiff alleges that she became aware of fraudulent conduct performed at the direction of Wells Fargo that involved the unauthorized opening and use of consumer accounts and offering improper sales incentives to its employees.  (*Id.* ¶ 7.)  Plaintiff believed these actions to be "illegal, fraudulent, and in violation of public policy."  (*Id.*)  Accordingly, in June of 2015, Plaintiff terminated a Wells Fargo employee, J.K., who had engaged in such practices.  (*Id.* ¶ 8.)  Plaintiff also attempted to terminate a second employee, B.R.D., for "helping to create the unlawful and fraudulent consumer account[s]," but her attempt was overruled by "the most senior member of Wells Fargo," who apparently approved of the fraudulent practices.  (*Id.* ¶ 9.)  Plaintiff alleges that following her termination of J.K. and attempted termination of B.R.D., Lee "began an effort to force Plaintiff out of the bank, including instituting an obviously malicious and pretextual investigation by [Odjidja], to drum up baseless wrongdoing by Plaintiff in retaliation for Plaintiff's protected activities."[2]  (*Id.* ¶ 10.)

---

[2]    It is unclear from the Amended Complaint what Odjidja's position at Wells Fargo was during this time period.

Shortly thereafter, in 2016, Congress began an investigation into Wells Fargo related to the fraudulent creation of consumer accounts. (*Id.* ¶ 11.) As a result of this investigation and negative news coverage of the Wells Fargo's conduct, Wells Fargo fired approximately 5,300 employees for engaging in these practices. (*Id.* ¶ 12.) On September 8, 2016, Wells Fargo entered into a Consent Order in which it acknowledged that the Company engaged in misconduct and agreed to be subjected to continued review by various government officials. (*Id.* ¶ 14.) According to Plaintiff, since that time, Wells Fargo has engaged in "an internal campaign to rid itself of employees who were simply present during the period when the Company and its employees engaged in fraudulent practices and has "sought to 'scape goat' employees and cast them in a false light, through improper abuse of its internal investigative efforts and by a policy of pretextual firings for cause." (*Id.* ¶ 15.) Plaintiff claims that, in so acting, Wells Fargo "employed a reign of terror against otherwise innocent employees" who did not engage in fraud and instead tried "to eradicate [the fraudulent policies] and [spoke] to investigative bodies regarding same." (*Id.* ¶ 17.)

Plaintiff alleges that in or around September or October 2018, Wells Fargo began a pretextual investigation of her in retaliation for her protected activity, including testifying before the Office of the Currency Comptroller ("OCC") April 2018,[3] terminating J.K, and attempting to terminate B.R.D. (*See id.* ¶ 21.) Specifically, Plaintiff alleges that Wells Fargo accused Plaintiff of discouraging employees from contacting an ethics help line, "notwithstanding that Plaintiff herself had a clear and documented history of encouraging ethics and ridding the bank of fraud." (*Id.*) Plaintiff further claims that she was falsely accused of engaging in inappropriate behavior by

---

[3]   Because Plaintiff's testimony before the OCC was nonpublic and confidential, the substance of her testimony has not been presented to the Court. What can be inferred, however, from the Amended Complaint is that her testimony related to the alleged illegal practices employed by Wells Fargo and was damning to the company.

3

consuming alcohol with her team that was provided by Wells Fargo after a bank event.  (*Id.*) Plaintiff maintains that Wells Fargo does not have a clear policy prohibiting alcohol consumption at team events and she was the only employee investigated and disciplined for this behavior, despite male employees engaging in the same activity.  (*Id.*)

On or about March 1, 2019, Plaintiff alleges that she was notified that she had ten days to accept retirement under certain conditions, including a requirement that she execute a non-disclosure agreement.  (*Id.* ¶ 13.)  Plaintiff alleges that during that ten-day period, she was terminated and given "contradictory and untrue justifications for her termination."[4]  (*Id.*)  Plaintiff contends that she was terminated in retaliation for her protected activity.  (*Id.*)

Plaintiff further alleges that as part of her long-term employment with Wells Fargo, she was awarded Wells Fargo stock pursuant to several delineated restricted stock plans.  Plaintiff states that at the time of her termination, she owned approximately 21,986 shares of Wells Fargo stock that were worth more than $1,000,000.00.  (*Id.* ¶ 24.)  Plaintiff claims that she became fully vested in this stock due to her term of service and age.  (*Id.* ¶ 25.)  Plaintiff apparently paid the Federal Medicare tax on these shares, as required, which entitles her to full ownership of the stocks. (*Id.*)  Nevertheless, Plaintiff alleges that Defendants breached its agreement to convey the shares to Plaintiff and unlawfully converted the value of the stocks.  (*Id.* ¶ 26.)

On April 1, 2019, Plaintiff filed a complaint in the Superior Court of New Jersey, Law Division, Monmouth County.  (*See* ECF No. 1-1.)  The action was removed to this Court on September 11, 2019.  (ECF No. 1.)  Plaintiff filed the Amended Complaint on October 4, 2019,

---

[4]     While not referenced in the Amended Complaint, it appears that Plaintiff was terminated for violating Wells Fargo's Information Security Policy by allegedly attempting to send confidential and privileged information to her personal e-mail address.  (*See* Gousman Cert., Ex. C.)

which asserts claims of breach of contract (Count One), conversion (Count Two), false light (Count Four), and tortious interference with prospective economic advantage (Count Six).  The Amended Complaint further alleges violations of CEPA, N.J. Stat. Ann. § 34:19-1 (Count Three), and the NJLAD, N.J. Stat. Ann. § 10:5-12 (Count Five).  On November 1, 2019, Defendants filed the instant Motion to Dismiss pursuant to Rule 12(b)(6), arguing that the Amended Complaint fails to state any claim against them.  This Motion was fully briefed on January 27, 2020.  Nearly two months later, on March 23, 2020, Plaintiff sought leave to file a sur-reply, attaching a proposed sur-reply and a declaration from Plaintiff.  The proposed sur-reply and declaration contain new factual allegations related to Plaintiff's testimony before the OCC.  Defendants have filed a response to the sur-reply.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  The complaint must include "enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted).  Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

## III.  DISCUSSION

### A.  *Count One – Breach of Contract*

In Count One of the Amended Complaint, Plaintiff asserts a claim of breach of contract based on Wells Fargo's alleged refusal to give Plaintiff access to her 21,986 shares of Wells Fargo

stock accrued as part of the Bank's long-term compensation plan.[5]   (Am. Compl. ¶¶ 28–32.) Plaintiff claims that she is fully vested in her ownership of the shares based on her age and term of service and because she paid the requisite Medicaid taxes on the shares.   (*Id.*)

Defendants move to dismiss this claim pursuant to the terms of the Wells Fargo & Company Long Term Incentive Compensation Plan (the "Plan") and various annual Restricted Share Rights Award Agreements (collectively the "Plan Documents"). While, generally, the Court's review on a motion to dismiss is limited to the allegations contained in the complaint, the Third Circuit has provided that "an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).   Here, because Plaintiff's breach of contract claim is explicitly based on the restricted stock plans she entered into as part of her employment at Wells Fargo, the Plan Documents are integral to the allegations underlying Plaintiff's claim and can be considered by the Court in resolving this Motion.   *See, e.g.*, *Bhatti v. Harmon Stores, Inc.*, No. 16-523, 2016 WL 5719680, at *4 & n.2 (D.N.J. Sept. 28, 2016) (considering employment handbook and incentive compensation plan on motion to dismiss where plaintiff relied on the documents in the complaint).

---

[5]      It appears that Plaintiff attempts to bring this breach of contract claim against both Wells Fargo and the Individual Defendants.   Plaintiff, however, cannot proceed with any breach of contract claim against the Individual Defendants because, quite simply, the Individual Defendants are not parties to the compensation plans at issue.   *See Ford v. VMWare, Inc.*, C.A. No. 11714, 2017 WL 1684089, at * 13 (Del. Ch. May 2, 2017) ("Only parties to a contract are bound by that contract." (quoting *Am. Legacy Found. v. Lorillard Tobacco, Co.*, 831 A.2d 335, 343 (Del. Ch. 2003))); *see also Koloni Reklam, Sanayi, Ticaret LTD/STI v. Viacom, Inc.*, No. 16-285, 2017 WL 726660, at *3 (D. Del. Feb. 23, 2017) ("It is a well-settled principal of contract law that 'only a party to a contract may be sued for breach of that contract.'" (quoting *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999))).

Delaware law governs the Court's analysis of Plaintiff's breach of contract claim because the Plan Documents contain a choice of law provision which provides that Delaware law shall govern "all determinations made and actions taken pursuant" to the Plan.  (*See, e.g.,* Gousman Cert., Ex D., ¶ 14; Gousman Cert., Ex. I, ¶ 29); *see also Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183–84 (3d Cir. 2017) ("New Jersey choice-of-law rules provide that, '[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.'" (alteration in original) (quoting *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 130 N.J. 324, 341 (1992))).  To state a claim for breach of contract under Delaware law, "a plaintiff must allege (1) the existence of a contact; (2) breach of the contract; (3) damages as a result of the breach; and (4) that plaintiff performed its duties under the contract." *Bulut v. JP Morgan Chase Bank, N.A.*, No. 18-9303, 2019 WL 1930757, at *4 (D.N.J. May 1, 2019) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)). Moreover, in pleading a breach of contract claim, a plaintiff is required to "identify the specific contract clause that was breached." *Id.* (citing *WalMart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)).

Here, Defendants argue that Plaintiff's breach of contract claim should be dismissed because, despite Plaintiff's allegations to the contrary, her shares were not all fully vested under the Plan Documents.  Defendants maintain that the Plan Documents make clear that Plaintiff's shares would vest pursuant to specific vesting schedules, and that the Plan Documents do not provide that Plaintiff's shares would vest upon reaching retirement age nor upon Plaintiff's payment of Medicare taxes.  Moreover, Defendants contend that the Plan Documents provide that if Plaintiff was terminated for cause, any unvested shares would be "immediately terminated without notice to [Plaintiff]."  (*See* Gousman Cert., Ex. D ¶ 3(d); *id.*, Ex. E, ¶ 3(e); *id.*, Ex. F, ¶

3(e); *id.*, Ex. G. ¶ 3(e); *id.*, Ex. I, ¶ 9.4(b).)  Plaintiff does not respond to these arguments.

Having reviewed the Plan Documents in question, it is clear that Plaintiff cannot state a claim for breach of contract, as her claim is pleaded.  The Plan Documents, themselves, belie Plaintiff's allegation that her stock shares vested based upon her retirement age and her payment of Medicare taxes owed on the shares.  They indeed make clear that at the time of Plaintiff's termination, some of her shares had not, in fact, vested because they were scheduled to vest after the date of her termination.  For example, Plaintiff's 2018 Restricted Share Rights Award Agreement provides that the shares that were awarded to Plaintiff as part of that agreement would vest on March 15th of each year from 2019 to 2022.  (*See* Gousman Cert., Ex. G, ¶ 2.)  Each of Plaintiff's award agreements from 2015 to 2017 provides for a similar vesting schedule.  (*See* Gousman Cert., Ex. D ¶ 2 (2015 Agreement); *id.*, Ex. E, ¶ 2 (2016 Agreement); *id.*, Ex. F, ¶ 2 (2017 Agreement).)  It is thus apparent that some of Plaintiff's shares had not vested at the time of her termination and she was therefore not entitled to ownership of those shares.  The Amended Complaint, however, does not make clear whether Plaintiff received the stock shares that had vested at the time of her termination.  Indeed, if Plaintiff were to allege that she was denied ownership of stock shares that had fully vested, she could very well make out a breach of contract claim for these shares.  However, the Amended Complaint, in erroneously alleging that all of Plaintiff's shares had vested, fails to make this critical distinction.  For this reason, Plaintiff's contract claim, as pleaded, cannot stand as the terms of the Plan Documents contradict the allegations made in her Complaint that underlie her breach of contract claim.  *See Ark Grp., Inc. v. Shield Restraint Sys., Inc.*, 2018 WL 4926449, at *2 (D. Del. Oct. 10, 2018) ("The court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations in a complaint.").

Moreover, Defendants argue that Plaintiff's breach of contract claim fails because the terms of the Plan provide that all "decisions, determinations and interpretations by the [HR Committee of the Board (the "Committee"), or its agent(s)] regarding the plan . . . shall be final and binding on all participants." (Defs.' Moving Br., at 16.) Plaintiff does not dispute that the Plan contains such a clause. Plaintiff contends, however, that the decision of the Committee is the product of "fraud, bad faith or the like," because, she alleges, the decision to deny her stock was further retaliation for her protected activity. (Pl.'s Opp., at 18.) Under Delaware law, "when a stock option committee is vested with final, binding and conclusive authority to determine a participant's right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith." *W.R. Berkley Corp. v. Niemela*, C.A. No. 17-32, 2019 WL 5457689, at *5 (D. Del. Oct 24, 2019) (quoting *W.R. Berkley Corp. v. Hall*, No. Civ. A. 03C-12-146WCC, 2005 WL 406348, at *4 (Del. Super. Ct. Feb. 16, 2005)). Plaintiff has not adequately pleaded any basis for the fraud or bad faith exception to apply. While the Amended Complaint contains the conclusory allegation that the denial of her stock shares was retaliatory, she fails to support that allegation with any specific facts that would connect the denial of her unvested stock shares to the alleged retaliation she faced for engaging in protected activity. The connection Plaintiff is attempting to make is simply too attenuated based on the factual allegations contained in the Amended Complaint.

Accordingly, Plaintiff's breach of contract claim will be dismissed without prejudice.

### B.  *Count Two – Conversion*

Plaintiff's conversion claim rests on the same facts as her claim for breach of contract. In support of her conversion claim, Plaintiff alleges that she "became the vested owner of approximately 21,986 shares of Wells Fargo stock . . . and had the right to immediate possession

of same [and] Defendant wrongly interfered with Plaintiff's right to possess, take title to and own[ership] of said stock."  (Am. Compl. ¶¶ 34–35.)  Defendants argue that this claim must be dismissed because Plaintiff had no ownership rights to the unvested shares of stock.  Plaintiff makes the same argument against dismissal as she does in support of her breach of contract claim.

The claim of conversion involves the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."  *Chicago Title Ins. Co. v. Ellis*, 978 A.2d 281, 287 (N.J. Super Ct. App. Div. 2009); *see also Arcand v. Brother Intern. Corp.*, 673 F. Supp. 2d 282, 311 (D.N.J. 2009) (noting that conversation is defined as "some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some at done which has the effect of destroying or changing the quality of the chattel").  The Court finds Plaintiff fails to state a conversion claim, because she has not pleaded that she had any ownership right to the stock shares in question.  As explained above, the Plan Documents undermine, in unambiguous language, Plaintiff's allegation that her interest in the shares vested when she reached retirement age and paid the Medicare taxes on the shares.  I cannot credit Plaintiff's allegations in this regard.  Accordingly, because Plaintiff had no ownership right to the unvested stock shares, she cannot state a claim of conversion.

## C.  Count Three – CEPA

CEPA "is remedial legislation that protects an employee from employer retaliation in cases where the employee 'blows the whistle' on illegal or unethical activity."  *Reynolds v. TCM Sweeping, Inc.*, 340 F. Supp. 2d 541, 545 (D.N.J. 2004) (citing *Hernandez v. Montville Twp. Bd. of Educ.*, 808 A.2d 128 (N.J. Super. Ct. App. Div. 2002)).  To establish a cause of action under CEPA, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J. Stat. Ann. 34:19-3[];
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003); *see also Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015). N.J. Stat. Ann. § 34:19-3 provides for three types of whistleblowing activity that are protected by the statute. First, CEPA protects any employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or (2) is fraudulent or criminal." N.J. Stat. Ann. § 34:19-3(a)(1)–(2). Second, CEPA protects any employee who "[p]rovides information to, or testifies before, any public body conducting an investigation, hearing, or inquiry into any violation of law." N.J. Stat. Ann. § 34:19-3(b). And, third, CEPA protects an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law . . . ; (2) is fraudulent or criminal . . . ; or (3) is incompatible with a clear mandate of public policy." N.J. Stat. Ann. § 34:19-3(c). Here, Plaintiff alleges that she engaged in protected activity under CEPA by testifying before the OCC and "refusing to participate and disclosing an activity, policy and practice of her employer and co-employees that she reasonably believed was unlawful, fraudulent, criminal, [and] in violation of public policy and the law[]." (Am. Compl. ¶ 38.) Plaintiff claims that as a result of this protected activity, "Defendants unlawfully terminated her employment, cast her in a false light and refused to pay the stock she earned and in which she

became fully vested." (*Id.*)

Defendants argue that Plaintiff's CEPA claim must be dismissed for several reasons. First, Defendants contend that Plaintiff fails to allege that she actually disclosed any law or public policy that was violated in connection with her recommendation to terminate J.K. and B.R.D. (Def.'s Moving Br., at 19.) Moreover, Defendants argue that Plaintiff fails to plead any causal connection between her protected activity and the termination of her employment. (*Id.* at 20–21.) And, finally, Defendants assert that the temporal lapse between Plaintiff's alleged protected activity and her termination negates any alleged causal connection. (*Id.* at 21.)

While the allegations of the Amended Complaint are somewhat generalized, making all reasonable in Plaintiff's favor, the Court finds that Plaintiff has made sufficient allegations with respect to the first three prongs of a CEPA claim. The first element of a CEPA claim requires that complaint, at the very least, allege that the plaintiff "reasonably believed that [her] employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy." *Dzwonar*, 828 A.2d at 900. However, "[p]laintiff need not identify a particular law, regulation, or public policy 'as long as the court can identify the law or policy that might have been violated by the challenged conduct.'" *Rickerson v. Pinnacle Foods Inc.*, No. 17-4469, 2017 WL 6034147, at *3 (D.N.J. Dec. 6, 2017) (quoting *Griffin v. Metromedia Energy, Inc.*, No. 10-3739, 2011 WL 12872504, at *3 (D.N.J. Feb. 7, 2011)).[6] Defendants contend that, to the extent Plaintiff's CEPA claim is premised on her two termination decisions, she has failed to allege

---

[6] Defendants rely on a number of cases in support of their argument that Plaintiff is required to identify a specific law, regulation or public policy that she believed was violated. Those cases, however, do not lend such support. For example, Defendants cite to *Baldani v. Twp. of Millburn*, No. 07-4792, 2008 WL 4512939 (D.N.J. Sept. 29, 2008). In that case, the plaintiff's CEPA claim was dismissed because it was devoid of any reference to any violation of law or public policy and only alleged that plaintiff reported "certain wrongs" to his supervisor. *Id.* at *7. Such conclusory allegations are plainly insufficient under Rule 12(b)(6).

that "Plaintiff actually disclosed (or threatened to disclose) a statute, regulation, rule or public policy that Plaintiff allegedly believed was violated in connection with those termination recommendations." (Pl.'s Opp. Br., at 19.) However, in making this argument, Defendants conflate the first two elements of a CEPA claim. On the first element, Plaintiff need only allege that she believed that Wells Fargo's conduct was in violation of a law, regulation or public policy. The Amended Complaint contains sufficient allegations on this prong. Plaintiff alleges that in June of 2015, "Plaintiff discovered fraudulent conduct of Wells Fargo employees, performed at the direction of Wells Fargo's managers, executives and corporate hierarchy, relating to unauthorized opening and use of consumer accounts and creating improper sale incentives as well as undo sales pressure." (Am. Compl. ¶ 7.) Plaintiff alleges that she "immediately understood and reasonably believed these actions, policies, and practices of Wells Fargo to be illegal, fraudulent, and in violation of public policy." (*Id.*) These allegations are sufficient to demonstrate that Plaintiff reasonably believed that Wells Fargo's practice of opening consumer accounts without authorization was fraudulent. Accordingly, the first CEPA prong is satisfied.

Next, the Court considers whether Plaintiff has sufficiently alleged that she engaged in whistleblower activity. Plaintiff raises two instances in which she allegedly engaged in protected activity. First, Plaintiff contends that her termination of J.K. and attempted termination of B.R.D. for engaging in the "fake account scandal" was protected under N.J. Stat. Ann. § 34:19-3(c) as that conduct demonstrated her objection to and refusal to participate in such activities. However, as Defendants point out, Plaintiff fails to explain how these termination decisions constituted an objection to or refusal to participate in the alleged fraudulent scheme. Nevertheless, while the terminations may not constitute protected activity, Plaintiff's testimony before the OCC does. While Plaintiff only vaguely references her testimony to the OCC in the Amended Complaint, that

14

activity is clearly protected under N.J. Stat. Ann. § 34:19-3(b), which shields from retaliation an employee who "[p]rovides information to, or testifies before, any public body conducting an investigation, hearing, or inquiry into any violation of law."  While Defendants argue that there is no indication Plaintiff disclosed or threatened to disclose any perceived misconduct to the OCC, there is no such requirement under N.J. Stat. Ann. § 34:19-3(b).  And, moreover, while the Court has not been provided with substantive details of Plaintiff's OCC testimony it is apparent that it related to the allegedly illegal conduct committed by Wells Fargo and its employees.  Accordingly, because Plaintiff's OCC testimony constitutes whistleblower activity under CEPA, the second prong is satisfied.

Plaintiff has similarly satisfied the third prong of a CEPA claim since there is no dispute that that her termination from Wells Fargo constitutes an adverse employment action under the statute.  *See* N.J. Stat. Ann. § 34:19-2(e) (defining retaliatory action as "the discharge, suspension, or demotion of an employee, or other adverse employment action taken against an employee"); *Schlichtig v. Inacom Corp.*, 271 F. Supp. 2d 597, 609 (D.N.J. 2003) (finding that termination from employment "clearly falls within the type of 'retaliatory conduct' CEPA was intended to prohibit").

Plaintiff's claim, however, fails to allege a causal connection between her protected activity and her termination.[7]  Plaintiff argues that causation is demonstrated by (1) the fact that her testimony to the OCC was "damning" to Wells Fargo, (2) that she had been promoted regularly

---

[7]     In support of this argument, Plaintiff points to certain evidence outside the Amended Complaint that she contends supports a causal connection between her termination and her whistleblower activity.  Specifically, Plaintiff cites a Human Resources report from 2018 that praises her ethics and news reports regarding Wells Fargo's alleged *modus operandi* of retaliating against employees who reported the fraudulent creation of consumer accounts.  These documents are not reflected in the allegations contained in the Amended Complaint and, therefore, will not be considered by the Court on this motion.

prior to engaging in the protected conduct, and (3) that she was the subject of two "pretextual" investigations between 2016 and 2018.  These allegations, however, are simply too remote and conclusory to support the allegation that Plaintiff was terminated in retaliation for any whistleblower activity.  Indeed, to satisfy the causation prong of a CEPA claim, a plaintiff must allege sufficient facts from which "the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." *Bowles v. City of Camden*, 993 F. Sup. 255, 265 (D.N.J. 1998).  That inference may be based on circumstantial evidence, such as "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action."  *Zaffuto v. Wal-Mart Stores, Inc.*, 130 F. App'x 566, (3d Cir. 2005) (quoting *Kolb v. Burns*, 727 A.2d 525, 531 (N.J. Super. Ct. App. Div. 1999)).

One way that a plaintiff may establish causation through circumstantial evidence is by showing a temporal proximity between the protected conduct and the alleged retaliation.  *See Choy v. Comcast Cable Comms., LLC*, 629 F. App'x 362, 365 (3d Cir. 2015).  It is, however, "important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."  *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 856 (D.N.J. 2019) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).  Here, Plaintiff's alleged protected conduct—the two termination decisions and her OCC testimony—occurred in June 2015 and April 2018, respectively.  Plaintiff was not terminated from her employment at Wells Fargo until April 2019, nearly a year after engaging in any protected activity.   This tends to negate any inference of causation.  *See, e.g.*, *Choy*, 629 F. App'x at 365 (finding that six-week period between protected activity and termination failed to raise an inference of causation); *Urey*

16

*v. Grove City College*, 94 F. App'x 79, 81 (3d Cir. 2004) ("Generally, it can be said that 'if at least four months pass after the protected action without employer reprisal, no inference of causation is created.'" (quoting *Woods v. Bentsen*, 889 F. Supp. 179, 187 (E.D. Pa. 1995))); *Cohen*, 419 F. Supp. 3d at 856 (finding that plaintiff could not establish an inference of causation based on temporal proximity because three months elapsed between the alleged protected activity and the alleged retaliation); *but see Radwan v. Beecham Labs.*, 850 F.2d 147, 152 (3d Cir. 1988) (finding inference of causation where there was no temporal proximity between the protected conduct and the retaliation).[8]

Plaintiff's attempts to connect the alleged pretextual investigation of her in the fall of 2018 are similarly unavailing on the issue of causation. Plaintiff claims that five months passed between her OCC testimony and the second pretextual investigation of her that, she claims, resulted in her termination. (*See* Pl.'s Opp. Br., at 11.) However, the Amended Complaint fails to connect that investigation, which was apparently based on allegations that Plaintiff discouraged employees from contacting an ethics hotline, to Plaintiff's later termination. (*See* Am. Compl. ¶¶ 21–23.) Indeed, Plaintiff's attempt to connect her OCC testimony or the 2018 investigation to her termination are vague and conclusory. The only allegations in the Amended Complaint regarding

---

[8]     Plaintiff contends, without citation, that "[n]o court has held that the timeframe between the protected activity and the adverse employment [action] creates a negative inference" of causation on a motion to dismiss under Rule 12(b)(6). (Pl.'s Opp. Br., at 10.) Yet, a review of case law from this District demonstrates that it is appropriate to consider whether the timing of an adverse employment action tends to support a causal connection. *See, e.g.*, *Bobo v. Wildwood Public Schs. Bd. of Educ.*, No. 13-5007, 2014 WL 7339461, at *14 (D.N.J. Dec. 23, 2014) (dismissing CEPA claim where "the absence of temporal proximity between Plaintiff's whistle-blowing activity and his suspension and termination suggests otherwise, and fails to establish the requisite causal link required to state a prima facie case under CEPA"); *see also Myers v. Advanced Stores Co. Inc.*, No. 19-18183, 2020 WL 2744632, at *5 (D.N.J. May 27, 2020) (considering timing of alleged retaliatory action on motion to dismiss under Rule 12(b)(6)); *Choy v. Comcast Cable Comm., Inc.*, No. 08-4092, 2012 WL 253382, at *10 (D.N.J. Jan. 26, 2012).

her termination are that she "was given contradictory and untrue justifications for her termination" and that the real motive for her termination was to retaliate against her for her OCC testimony. (*See id.* ¶ 23.)    Even if the Court were to accept that the 2018 investigation was conducted in retaliation for Plaintiff's OCC testimony, there is no allegation that the decision to terminate Plaintiff was based on the results of the 2018 investigation.

Nor is the fact that Plaintiff had not been promoted since 2015 indicative of causation. Plaintiff asserts that prior to 2015, she had "been promoted multiple times."  But, following her promotion to lead region president in 2015, she was never promoted again.  However, tellingly, Plaintiff fails to claim that she applied for any promotion or that she was even eligible for any promotion between 2015 and the time of her termination.  Absent such information the Court cannot infer any retaliatory motive from Plaintiff's lack of promotion.

And, further problematic is the fact that the Amended Complaint fails to allege that the Individual Defendants had knowledge of Plaintiff's OCC testimony.[9]  Indeed, the only allegations made against Lee and Odjijda in the Amended Complaint are that, following Plaintiff's attempted termination of B.R.D., "Lee began an effort to force Plaintiff out of the bank, including instituting an obviously malicious and pretextual investigation by [Odjijda] to drum up baseless wrongdoing by Plaintiff in retaliation for Plaintiff's protected activity."  (Am. Compl. ¶ 10.)  The Amended Complaint is otherwise devoid of any allegations that (1) Lee and Odjijda were involved in

---

[9]    Plaintiff filed a certification in support of her opposition to the Motion to Dismiss in which she claims that she voiced concerns that Lee was retaliating against her to human resources in May 2018 and that Lee was aware that Plaintiff was going to testify before the OCC. These allegations, however, were not raised in the Amended Complaint and, therefore, cannot be considered by the Court on this Motion to Dismiss.  *See Warfield v. SEPTA*, 460 F. App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by raising arguments for the first time in a brief in opposition to a motion for summary judgment."); *Li v. Metropolitan Life Ins. Co.*, No. 16-1845, 2016 WL 5477994, at *3 (D.N.J. Sept. 26, 2016) (disregarding allegations raised in plaintiff's opposition to a motion to dismiss).

Plaintiff's termination or (2) were aware of Plaintiff's testimony to the OCC.  Without such allegations, no inference of causation may be drawn.  *See Robles v. U.S. Environmental Universal Servs., Inc.*, 469 F. App'x 104, 108 (3d Cir. 2012) (noting that, in the context of a CEPA claim, "[t]he plaintiff must also establish that the employer knew of the protected activity"); *Dominguez v. Costco Wholesale Corp.*, 356 F. App'x 611, 614 (3d Cir. 2009) (affirming summary judgment where plaintiff failed to present evidence that the decision-makers "knew about his [protected activity] when they decided to terminate his employment"); *Vatner v. Bd. of Trustees of the Univ. of Med.*, No. 12-3339, 2015 WL 461901, at *15 (D.N.J. Feb. 4, 2015) (finding that plaintiff failed to show causation where he failed to allege "which particular decision maker(s) had knowledge of his alleged whistleblowing activities"); *Kanafani v. Lucent Techs. Inc.*, No. 07-11, 2009 WL 3055363, at *10 (D.N.J. Sept. 18, 2009) ("But, for causation to exist, there must be evidence to support a finding that the decision-makers knew about the protected activity.").

Plaintiff in an apparent attempt to cure the deficiencies of her pleading, has submitted to the Court a sur-reply in which she newly alleges certain facts related to her OCC testimony that, she claims, demonstrates that her attorney, who represented her with respect to her OCC testimony and was provided by Wells Fargo, disclosed the substance of her OCC testimony to Wells Fargo's counsel and counsel passed that information to Wells Fargo.  From the outset, the Court will not consider these new allegations as they plainly constitute an improper attempt to amend.  It is well accepted that a plaintiff may not use an opposition to a dispositive motion as an opportunity to amend her complaint.  *See Scott v. Cohen*, 528 F. App'x 150, 152 (3d Cir. 2013) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989)); *Warfield*, 460 F. App'x at 132 ("A plaintiff may not amend a complaint by raising arguments for the first time in

a brief in opposition to a motion for summary judgment."); *Li*, 2016 WL 5477994, at *3 (disregarding allegations raised in plaintiff's opposition to a motion to dismiss).  And, even if the Court were to consider the allegations raised in the sur-reply, they suffer from the same problems as the Amended Complaint.  Indeed, while Plaintiff alleges that Wells Fargo knew about her testimony as early as May 2018, she was not terminated until nearly a year later.  And, moreover, the new allegations raised in the surreply still fail to implicate the Individual Defendants.[10]

In sum, the Amended Complaint fails to raise any causal nexus between Plaintiff's alleged whistleblower activity and her termination.  Accordingly, Plaintiff's CEPA claim is dismissed without prejudice.

### D.  False Light

Plaintiff next asserts a claim for false light and alleges that Defendants published statements about her and her termination that were untrue and that cast her in a false light and caused her personal and professional reputation to be irreparably damaged.  (*See* Am. Compl. ¶¶ 42–43.)  While the Amended Complaint fails to identify exactly upon which statements Plaintiff relies for her false light claim, in her Opposition, Plaintiff argues that "it may be reasonably inferred that Plaintiff, in searching for subsequent employ[ment], was put in the position of having to disclose Well[s] Fargo's stated reason for terminating her to prospective employers."  (Pl.'s Opp., at 23.)  Defendants argue that Plaintiff's false light claim must be dismissed because she has not identified any statement made by any defendant regarding Plaintiff's termination, nor has she demonstrated that any such statement was made with knowledge of reckless disregard of its falsity.

---

[10]     The sur-reply additionally alleges that Defendants' counsel may not have been forthcoming in the arguments made in support of their motion to dismiss because they "appear to be the conduit by which Wells Fargo may have learned about the details of Plaintiff's non-public OCC testimony."   (*See* Pl.'s Sur-reply, at 4.)  This argument, much like Plaintiff's allegations with respect to the disclosure of her OCC testimony, is unsubstantiated and based solely on speculation.

Plaintiff makes little response to this argument.

To state a claim of false light under New Jersey law, a plaintiff must allege that (1) "the false light in which [she] was placed would be highly offensive to a reasonable person" and (2) "the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 315 (D.N.J. 2016) (alteration in original) (quoting *Durando v. Nutley Sun*, 37 A.2d 449, 458 (N.J. 2012)). Plaintiff's claim does not pass muster under Rule 12(b)(6). The claim rests solely on the conclusory allegation of "Defendants published statements about Plaintiff that were untrue." (Am. Compl. ¶ 42.) This is insufficient—to state a claim of false light Plaintiff must, at the very least, identify the publicized statements that were made about Plaintiff and who made those statements. Because even the most basic element of a false light claim was not alleged, this claim is dismissed.

### E. NJLAD

In Count Five of the Amended Complaint, Plaintiff asserts a claim under the NJLAD for alleged gender discrimination. Plaintiff claims that she suffered an adverse employment action because she is female and that her male counterparts have not suffered the same actions. (Am. Compl. ¶ 45.) More specifically, Plaintiff alleges that she was disciplined for violating Wells Fargo's alcohol use policy and that Wells Fargo did not discipline males that engaged in the same conduct. (*See id.* ¶¶ 22, 46.)

Under the NJLAD, it is unlawful for an employer to discriminate against an individual with respect to the terms and conditions of his or her employment on the basis of a protected characteristic, which includes race, religion, age, sex, and disability. N.J. Stat. Ann. § 10:5-12(a). In assessing claims under the NJLAD, courts employ the burden-shifting framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 171 (3d Cir. 2017). "Under the burden-shifting framework, if a plaintiff makes out a *prima* facie case, the burden shifts to the employer to show that the adverse employment decision happened for legitimate, non-discriminatory reasons." *Id.* at 171. To state a claim for disparate treatment under the NJLAD, a plaintiff "must show that she belongs to a protected class, that she was performing her job at a level that met her employer's legitimate expectations, that she suffered an adverse employment action, and that others not within that protected class did not suffer similar adverse employment actions." *Kimber-Anderson v. City of Newark*, 502 F. App'x 210, 212 (3d Cir. 2012) (citing *El-Sioufi v. St. Peter's Univ. Hosp.*, 887 A.2d 1170, 1182 (N.J. Super. Ct. App. Div. 2005)). Put differently, "plaintiff must show that an adverse employment action occurred and that the facts reflect that discrimination was the cause for that action." *Id.*

Critical to Plaintiff's NJLAD claim is her failure to sufficiently allege that she suffered an adverse employment action in connection with the discipline she received for the alleged violation of the alcohol consumption policy. The Amended Complaint contains only vague reference to any adverse action suffered by Plaintiff with respect to the alcohol violation; she claims she "was disciplined, and other adverse actions were taken against her." (Am. Compl. ¶ 11.) An adverse employment action under the NJLAD is an action "which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001); *Marrero v. Camden Cty. Bd. of Social Servs.*, 164 F. Supp. 2d 455, 473 (D.N.J. 2001) ("In order to constitute 'adverse employment action' for the purposes of the NJLAD, 'retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an

employee.'"); *see also Williams v. Verizon N.J., Inc.*, No. 19-9350, 2020 WL 1227663, at *8 (D.N.J. Mar. 12, 2020). "Although actions short of termination may constitute an adverse employment action within the meaning of the statute, 'not everything that makes an employee unhappy is an actionable adverse action.'" *Cokus v. Bristol Myers Squibb Co.*, 827 A.2d 1173, 1180 (N.J. Super. Ct. App. Div. 2002) (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)). Making all reasonable inferences in Plaintiff's favor, the Court cannot find that Plaintiff has sufficiently alleged she suffered an adverse action related to the alcohol violation. The Amended Complaint on this issue is vague and conclusory and does not indicate that the terms of Plaintiff's employment were in any way affected by the discipline she received.[11] As Plaintiff has not sufficiently alleged that she suffered any adverse employment action as a result of the alcohol policy violation, her claim under the NJLAD is dismissed.

### F. Tortious Interference

Finally, in Count Six of the Amended Complaint, Plaintiff asserts a claim of tortious interference with prospective economic advantage. In support of that claim, Plaintiff alleges that

---

[11]    Defendants attach to their motion the "Final Notice" Plaintiff received as a result of the alcohol policy violation. The Court declines to consider this document on this Motion to Dismiss, as unlike the Plan Documents discussed with respect to Plaintiff's breach of contract claim, the Final Notice is not integral to the pleadings nor is it explicitly relied upon. *See Mutschler v. Tritt*, 685 F. App'x 167, 169 n.2 (3d Cir. 2017). In any event, consideration of the document does not alter my analysis of Plaintiff's NJLAD claim as the Final Notice does not rise to an adverse employment action. The Final Notice does not indicate that the terms of Plaintiff's employment were in any way altered as a result of her receipt of the Final Notice. Indeed, the Final Notice merely provides that Plaintiff *may* be terminated if a similar situation occurred and that the notice *may* affect Plaintiff's eligibility for certain promotions and salary increases. The mere risk of a potential change in employment status is insufficient to demonstrate an adverse employment action was taken. *See, e.g.*, *Hargrave v. Cty. Of Atlantic*, 262 F. Supp. 2d 393, 426–28 (D.N.J. 2003) (finding that a notice of disciplinary action and negative evaluation were not adverse employment actions under the NJLAD); *Scott v. New Jersey*, 143 F. App'x 443, 446 (3d Cir. 2005) ("Oral reprimands and derogatory comments do not qualify as adverse employment actions . . .").

she "has the right and reasonable expectation to pursue a lawful business and career and to enjoy the fruits and advantages of her industry." (Am. Compl. ¶ 49.) Plaintiff alleges that Defendants disturbed that right by "wrongfully terminating Plaintiff and casting her in a false light." (*Id.* ¶ 50.)[12]

To state a claim under New Jersey law for tortious interference with prospective economic advantage, a plaintiff must allege: (1) the existence of a reasonable expectation of an economic advantage; (2) the interference was done intentionally and with malice; (3) absent the interference there was as reasonable probability that the plaintiff would have received the anticipated economic benefits and (4) the injury caused the damage. *MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996) (citation omitted). In the context of tortious interference with an employment relationship, a plaintiff can only proceed with a claim against a supervisor "when [the] employee asserts that [the] supervisor was acting outside the scope of his employment and/or for his own personal gain." *Marrin v. Capital Health Sys., Inc.*, No. 14-2558, 2015 WL 404783, at *6 (D.N.J. Jan. 29, 2015) (quoting *Marrero*, 164 F. Supp. 2d at 478.

Here, Plaintiff argues that she has stated a claim for tortious interference because it can be inferred from the Amended Complaint that "but for the tortious inference by Defendants," Plaintiff would have continued her employment at Wells Fargo. (Pl.'s Opp. Br., at 21.) Defendants, however, contend that because Plaintiff was an at-will employee, she could not have had a reasonable expectation of indefinite employment at Wells Fargo because the Company could

---

[12]    It appears that Plaintiff brings this claim against both Wells Fargo and the Individual Defendants. While not raised by the parties, it is well-established that the claim of tortious interference can only "be directed against defendants who are not parties to the relationship." *See Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989). Because Wells Fargo, as Plaintiff's former employer, is party to Plaintiff's employment relationship, this claim cannot proceed against Wells Fargo.

terminate that employment for any reason.  (Def.'s Moving Br., at 27 (quoting *Day*, 2018 WL 1891476, at *2).)  The mere fact that Plaintiff was an at-will employee, however, does not prevent her from stating a claim for tortious interference as "[a]n at-will employee may possess a protectable expectation of economic advantage."  *See Barrett v. Walgreens, Inc.*, No. 12-6259, 2015 WL 1021276, at *10 (D.N.J. Mar. 6, 2015); *see also Varallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (noting that plaintiff's status as an at-will employee did "not affect his claim of tortious interference with prospective economic advantage").  In *Barrett*, for example, the district court determined that a reasonable jury could find that the plaintiff's long-time employment with Walgreen's "gave him an expectation of continued economic benefit." *Id.*  Accordingly, the Court finds that the Amended Complaint sufficiently alleges that Plaintiff had a reasonable expectation of continued employment at Wells Fargo based on her long term of service for the company.

The Amended Complaint, however, fails to sufficiently allege that the Individual Defendants—Lee and Ojidja—were involved in the decision to terminate Plaintiff's employment and, if they were involved in that decision, acted outside the scope of their employment.  Plaintiff responds, without legal support, that where a supervisor engages in retaliation or discrimination, they do not act in the scope of their employment.  However, that is not an accurate statement of the law.  The courts in this District have consistently determined that simply because a supervisor "act[ed] with an allegedly improper motive does not remove their actions from the scope of their employment." *See Marrero*, 164 F. Supp. 2d at 478–79; *see, e.g., Fioriglio v. City of Atlantic City*, 996 F. Supp. 379, 392 (D.N.J. 1998) (dismissing tortious interference claim where complaint did not indicate that retaliatory conduct allegedly committed by defendants was done outside the scope of their employment).  Plaintiff's Amended Complaint is devoid of any indication that Lee and Ojidja were involved in the decision to terminate Plaintiff and, to the extent they were involved in

that decision, acted outside the scope of their employment in doing so.  As such, Plaintiff's tortious interference claim is dismissed against all Defendants.

## IV.    CONCLUSION

For the forgoing reasons, Defendants' Motion to Dismiss is **GRANTED**.  Plaintiff's Amended Complaint is dismissed without prejudice.  Plaintiff may file an amended complaint that addresses the deficiencies highlighted with respect to only her CEPA claim and her contract claim within 30 days of the date of the Order accompanying this Opinion.  To the extent additional evidence supporting Plaintiff's other claims is revealed in discovery, Plaintiff may move to amend those claims at a later date.


Dated: June 19, 2020                                          /s/ Freda L. Wolfson
                                                              Freda L. Wolfson
                                                              U.S. Chief District Judge