## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LARISA PERRY,<br><br>                *Plaintiff*,<br><br>v.<br><br>MICHELLE LEE, WELLS FARGO BANK, N.A., JANE DOE and RICHARD ROE, fictitiously name defendants.,<br><br>               *Defendants*. | Civil Action No.<br>3:19-cv-17899 (PGS)(TJB)<br><br>**MEMORANDUM** |

This case is before the Court by way of a motion for summary judgment filed by defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Michelle Lee ("Lee") (collectively, "Defendants") (ECF No. 71). The Court held oral arguments on July 18, 2023. The parties' arguments were taken under advisement.

Defendants seek summary judgment contending: (1) Perry cannot establish a causal connection between her testimony before the OCC and any alleged adverse employment action taken against her, and therefore, cannot meet the requirements for a prima facie CEPA claim; (2) Defendants had a "legitimate, nondiscriminatory reason for taking the employment action." (N.J.S.A § 34:19-3(c); and (3) Perry cannot establish that Defendants' legitimate rationale for dismissal was pretextual. (ECF No. 71).

For the reasons set forth below, the Defendants' Motion to Dismiss is **RESERVED** in part and **DENIED** in part.

I.

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the action is between "citizens of different States," and the amount in controversy exceeds "75,000, exclusive of interest and costs."  Perry is a citizen of New Jersey.  (ECF No. 1 at ¶ 14). Wells Fargo is a citizen of South Dakota.  (*Id.* at ¶15; *Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 611 (D.N.J. 2012); *see also Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006)).  Lee is a citizen of North Carolina.  (ECF No. 1 at ¶ 16).

This matter was removed from the Superior Court of New Jersey, Law Division, Monmouth County, on September 11, 2019.  Venue is proper under 28 U.S.C. § 1441(a) as this Court is "the district and division embracing the place where such action is pending."  (28 U.S.C. § 1441(a)).

II.

Perry's Second Amended Complaint ("SAC") asserts a single count against Wells Fargo and Lee for violation of the New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1, et seq.  (ECF No. 44).  Perry contends she was the subject of two pretextual investigations and ultimately fired in retaliation for her testimony against Wells Fargo before the Office of the

Comptroller of the Currency ("OCC").  (ECF No. 44 at ¶ 34; ECF No. 82 at 19).

Perry seeks compensatory and punitive damages; attorneys and legal fees; injunctive

relief; and a civil fine and penalty.  (ECF No. 44 at ¶ 39).

Perry worked for Wells Fargo from 1992 to March 2019 when she was

terminated. (ECF No. 72 at ¶¶ 3–8).  In January 2015, Wells Fargo promoted Perry

to Lead Region President ("LRP") and transferred her from Orlando, Florida to New

Jersey.  (ECF No. 72 at ¶ 225).  In this position, Perry directly reported to Lee.  (ECF

No. 72 at ¶ 3; ECF No. 44 at ¶ 6).  As LRP, Perry managed approximately 7,600

employees with the authority to discipline those employees. (ECF No. 72 at ¶ 4).

Between 2015 and 2016, Perry repeatedly disciplined a Wells Fargo employee

whose initials are "BRD." BRD carried out unlawful sales practices, such as the

unauthorized opening and use of consumer accounts which artificially boosted Wells

Fargo's financial performance, and ultimately resulted in increased compensation

and promotions for BRD.  (ECF No. 44 at ¶ 7).  Despite Perry's discipline, she

alleges she was never authorized to terminate BRD.  (*Id.* at ¶ 8).  Evidently, BRD

had worked directly for Lee for seven years during which time BRD continuously

engaged in such practices without consequences.  (*Id.*).

Contemporaneously with the ongoing discipline of BRD, Wells Fargo was the

target of a Congressional investigation for unlawful and fraudulent banking practices

such as exerting unlawful sales pressure on bankers, and the simulated funding of consumer accounts.  (*Id.* at ¶ 9).

On September 8, 2016, Wells Fargo entered a voluntary consent order with the OCC Consumer Financial Protection Bureau in which Wells Fargo "acknowledged the Company's misconduct," and subjected its operations "to continued review by various officials and an independent consultant for compliance purposes."  (*Id.* at ¶ 10).  Pursuant to the consent order, the OCC investigation continued.  (*Id.* at ¶¶ 10–12).

Perry and Lee "engaged in continued discussions . . . about Plaintiff's desire to terminate BRD."  (ECF No. 44 at ¶ 14).  In November 2016, Perry discussed the status of the OCC investigation and BRD's continued employment at Wells Fargo with Wells Fargo's in-house counsel.  (*Id.*).  Perry was advised by in-house counsel that BRD could not be terminated "because termination would require the bank to speak to the Department of Justice due to a prior agreement that the bank would not conduct concurrent investigations or 'front run' other ongoing investigations."  (*Id.*).  Instead of taking more draconian measures, Perry placed BRD on final notice.  (*Id.*).

Thereafter, BRD was terminated in September 2017.  (ECF No. 72 at ¶ 100).  According to Defendants, the termination was the result of a reorganization rather than BRD's behavior.  (*Id.* at ¶ 100).

In January 2018, Wells Fargo alerted Perry that the OCC intended to subpoena her to testify regarding unethical sales practices at Wells Fargo. (ECF No. 82-2 at ¶ 20). Also in January 2018, Wells Fargo initiated an internal investigation into Perry's activities (Initial Investigation). (ECF No. 82-2 at ¶¶ 22–24). According to Wells Fargo, the Initial Investigation originated upon Lee's receipt of an anonymous letter alleging Perry: (1) criticized Lee, prominent Wells Fargo executives, and the Wells Fargo Board of Directors; (2) questioned the then-head of Wells Fargo's Community Banking Division, i.e. Mary Mack's ability to do her job; and (3) drank to excess at work events and made demeaning comments about team members. (*Id.*). The target resolution date of the Initial Investigation was February 19, 2018— around the same time as when Perry was to testify before the OCC. (*Id.* at ¶ 27).

Perry informed Lee when she was served with a subpoena. (*Id.* at ¶¶ 20–22). Although Perry was scheduled to testify in February 2018, it was delayed until April 2018. (*Id.*). Wells Fargo retained attorneys from the Parker Poe law firm to represent Perry. (ECF No. 72 at ¶ 139).

On March 2, 2018, the investigator met with Lee and Mary Mack about the Initial Investigation, and recommended minimal corrective action, specifically, a formal warning. (*Id.* at ¶¶ 39–41). Despite that recommendation, Lee allegedly chose to escalate the discipline to a Final Notice and to deduct more than $75,000.00 from Perry's 2017 bonus as a penalty. (*Id.* at ¶ 40). On March 15, 2018, Lee

summoned Perry to a meeting wherein Perry was given a Final Notice and her bonus deduction. (*Id.* at ¶ 41). This was the first formal discipline Perry incurred from Wells Fargo during her twenty-six year career. (*Id.* at ¶ 1).

Suspecting that the March 2, 2018 meeting would be adverse to her, Perry secretly recorded it. (ECF No. 72 at ¶ 101). Wells Fargo's Recording Devices policy "strictly prohibit[ed] any recording of . . . conversations [with a supervisor or Wells Fargo representative] by any electronic device with audio or video recording capabilities," and a violation was "grounds for corrective action, [including] termination." (*Id*. at ¶ 27). Perry contends the recording was to "'protect herself from termination' within the confines of New Jersey law." (ECF No. 82-1 at ¶ 102).

On or about March 16, 2018, Perry sent Mack an email appealing the Final Notice. (*Id.* at ¶ 148). On March 27, 2018, Perry's final notice was assigned to employee relations senior manager, Margaret Mullen ("Mullen"). (ECF No. 72 at ¶ 148).

Less than one month later, on April 11, 2018, Perry testified before the OCC (ECF No. 44 at 21.) At the regulatory hearing, Perry testified that she "was very concerned about the sales quality of South Jersey" and "the overall culture that was created from [BRD]'s leadership . . . ." (ECF No. 82-1 at ¶ 118). Perry further testified that she shared this concern with Lee who minimized BRD's infractions as ones that needed guidance. (*Id.*).

In addition, Perry testified:

- Perry stated that she had previously discussed failures in measuring sales metrics with Lee and other Wells Fargo employees on numerous occasions without responsive action. (ECF No. 82-2 at ¶ 62);

- Perry indicated that team members engaged in simulated funding to obtain sales credits in contravention of banking laws and regulations because team members felt pressured by unreasonable sales goals and the consequences of not meeting those goals. (*Id*. at ¶¶ 63–66);

- Perry stated that BRD created a "bad sales culture" at Wells Fargo.  (ECF No. 73-42 at T58:20 –T59:4; T60:19 –T61:4);

- Perry discussed concerns about BRD with Lee who minimized any disciplinary action and limited it to supplemental coaching of BRD and BRD's team. (*Id.* at T61:13–24);

- Perry concluded that she was placed on Final Notice because she placed BRD on Final Notice and BRD filed a bogus discrimination claim against her.  (*Id.* at T64:16–24);

- Perry concluded that a lack of meaningful leadership was to blame for the failure to uncover sales practice misconduct.  (*Id*. at T64:16–24);

- Perry stated that there was systemic dysfunction in the reporting of sales. (*Id.*).

Perry claims Defendants were aware of her OCC testimony through Perry's conversations with Mullen and the Parker Poe reports about same.  For example, during a conversation on May 4, 2018, Perry and Mullen discussed Perry's opinion that the Final Notice she received was related to BRD.  (ECF No. 82-19. at Ex. M). Perry informed Mullen that she testified before the OCC and was questioned about BRD.  (*Id*. at T7:4–17).  More specifically, they discussed the circumstances

surrounding BRD's termination and how Perry informed OCC that BRD's termination was delayed. (*Id.* at T3:7–T4:20; T4:21–T6:13).

Similarly, on June 5, 2018, the Parker Poe law firm participated in a telephone call with two other law firms representing Wells Fargo, Sullivan and Cromwell and McGuireWoods. During this phone call, Parker Poe directly revealed Perry's OCC testimony. (ECF No. 44 at ¶¶ 26–27).

Three months later in September 2018, Wells Fargo launched another investigation of Perry alleging that she discouraged another employee from contacting the ethics hotline (hereinafter the "Second Investigation"). (ECF No. 82-2 at ¶¶ 70–71). Several individuals accused Perry of discouraging employees from calling the ethics hotline. (*Id*. at ¶¶ 73–77). Additionally, Perry was accused of interfering with job opportunities and had negatively affected their compensation. (*Id*. at ¶ 79). On November 19, 2018, the Second Investigation concluded that Perry violated the Speak Up & Nonretaliation Policy and recommended her termination. (*Id*. at ¶ 81). Perry challenges this conclusion as pretextual. (*Id.*).

On March 1, 2019, Wells Fargo informed Perry of its findings from the Second Investigation: Perry violated her Final Notice and Wells Fargo's Speak-Up and Nonretaliation Policies. (*Id*. at ¶¶ 83, 186, 202). Perry considered herself effectively terminated as of this date. (*Id*. at ¶ 203).

In this notice of its findings, Wells Fargo offered Perry retirement and retention of certain benefits (such as Perry's unvested Restricted Share Rights ("RSRs")), if and only if, Perry agreed to release "All Claims" against Wells Fargo, including:

> Claims for wrongful termination, constructive discharge, termination in violation of public policy, retaliation, claims for compensation or any other monies allegedly due to you from Company, . . . any tort of any nature, claims for retaliation, discrimination or harassment . . . . (ECF No. 82-1 at ¶ 199).

This "Departure Agreement" remained open until March 21, 2019. (*Id*. at ¶ 202; ECF No. 44 at ¶ 21). At that point, if no agreement was reached, Perry faced termination. (ECF No. 82-1 at ¶ 199; ECF No. 44 at ¶ 21).

Following receipt of her termination and retirement offer on March 1, 2019, Perry emailed several Wells Fargo documents from her work email to her personal email including: (a) confidential personnel and customer information; (b) correspondence with Wells Fargo's legal department; and (c) correspondence regarding management committee meetings with attachments, including agendas and presentations. (ECF No. 82-1 at ¶¶ 204–10). Perry admits to sending emails but denies knowing that such emails were confidential. (*Id*. at ¶ 223; ECF No. 82-37 at T67:5–70:25).

In a March 7, 2019 letter, Wells Fargo notified Perry that the retirement option was no longer available because she violated the Information Security Policy. (ECF

No. 72 at ¶ 219; ECF No. 44 at ¶ 35).  Additionally, Perry was notified that she was terminated effective March 8, 2019 for violating the Wells Fargo Information Security policy.  (ECF No. 72 at ¶ 219).

About a year after her termination, Perry listed her home for sale (March 11, 2020) and sold it for $450,000 less than her purchase price of $1.95 million in December 2020.  (*Id.*).

### III.

A motion for summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020), amended, 979 F.3d 192 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id*. "The Court must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party." *Id*. (quoting *Anderson*, 477 U.S. at 255).  Moreover, summary judgment "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact:  it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  *Wasserman v. Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (internal marks omitted).  Where the moving party bears the burden of proof, the evidence presented in support of summary judgment must be "credible" and "entitled to a directed verdict if not controverted at trial."  *Id.* at 237.  "Once a moving party with the burden of proof makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact."  *Id*. at 238.

## IV.

To prevail on a CEPA retaliation claim, a plaintiff must prove that "(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity . . . ; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action."  *Duong v. Benihana Nat'l Corp*., No. 21-1088, 2022 WL 1125392, at *3 n.5 (3d Cir. Apr. 15, 2022) (quoting *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003).  If a prima

facie case is established, the burden shifts to the defendant to prove a legitimate, nondiscriminatory reason for instituting the employment action.

Then, the burden shifts back to plaintiff to demonstrate the defendant's reason was pretext for retaliation. *Winters v. N. Hudson Reg'l Fire & Rescue*, 50 A.3d 649, 662 (N.J. 2012). Additionally, the plaintiff must establish that the employer knew of the protected activity. *Mancuso v. City of Atlantic City*, 193 F.Supp.2d 789, 810 (D.N.J. 2002).

Pursuant to N.J.S.A. 34:19-2(e), "retaliatory action" means the discharge, suspension or demotion of an employee. Retaliation may be reasonably inferred from the circumstances surrounding the employment action, including (a) the temporal proximity between the protected activity and the alleged retaliatory action; and (b) inconsistencies or contradictions in the employer's reasoning for its action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000). *See also Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 270 (NJ. Super. Ct. App. Div. 2001); *Maimone v. City of Atlantic City*, 903 A.2d 1055, 1064 (N.J. 2006).

There are material facts at issue. More specifically, the parties disagree on two elements of plaintiff's CEPA claim: (1) whether Perry has established causation; and (2) whether Defendants have presented legitimate reasons supporting termination of Perry which are not pretext for retaliation.

Both of these issues are jury questions. The jury must decide whether the
Initial and Second investigations and the termination were in retaliation for Perry's
whistleblower testimony.  Here, the investigations of Perry by Wells Fargo are in
temporal proximity to Perry's negative OCC testimony.  The Initial investigation of
Perry and notice of OCC's intent to subpoena Perry happened around the same time
(January 2018).  The Initial investigation lasted through Perry's testimony in April
2018.  Moreover, the target resolution date of the Initial investigation was February
19, 2018—around the same date Perry was originally scheduled to testify in front of
the OCC.  (ECF No. 82-2 at ¶ 20; ECF No. 82 at 6). The Second Investigation was
initiated approximately five months after Perry's testimony—four months after
Perry disclosed details of her OCC testimony to Mullen, a sales manager, and three
months after Parker Poe disclosed information about Perry's OCC testimony on a
conference call with other outside counsel for Wells Fargo. The Second
Investigation continued through Perry's termination in March 2019.  (ECF No. 72
at ¶ 69).

Defendants admit the ultimate decision to terminate Plaintiff was made by
defendant Lee.  (ECF No. 72 at ¶ 90).  However, Defendants argue that Perry's
dismissal was due to the fact that Perry violated numerous policies: the Workplace
Conduct Policy, Recording Devices Policy, Speak Up & Nonretaliation Policy, and
the Information Security Policy.  But the jury could determine otherwise based upon

the credibility of the witnesses.  In addition, since Perry accused Lee of mismanaging BRD in her OCC testimony, the jury should assess Lee's motives for firing Perry; i.e. was the OCC's testimony on the policy violations behind the termination. (ECF No. 72 at ¶¶ 90, 199).  These circumstances raise questions of fact that a jury must decide concerning the causal connection issue.

V.    <u>Damages</u>

Defendants seek summary judgment on the following damages arguments: (1) Perry's unvested shares; (2) Relocation Expenses; and (3) Punitive Damages.  Perry has not responded to Defendants' arguments regarding unvested shares.

Federal Rule of Civil Procedure 56(e) provides that "[i]f the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Thus, despite lack of opposition, the Court "must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law." *Anchorage Assoc. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir.1990).

### a. Unvested Shares

If the jury finds that the termination was the result of Perry's whistleblower activities, the value of the unvested shares is a foreseeable elements of damages upon which Plaintiff may recover.

14

### b. Relocation Expenses

Defendants contend Perry is not entitled to recover "relocation" expenses in the amount of $450,000 in relation to her post-termination move from New Jersey to Florida. (ECF No. 71 at 33–34).   Plaintiff's relocation damages may be proximately caused by the Defendants' conduct if the facts support that it is a foreseeable damage.   For instance, "if an ordinary person under similar circumstances and by the use of ordinary care, could have foreseen the result, [*i.e.*, that some injury or damage would probably result] and either would not have acted or, if the person did act, would have taken precaution to avoid the result . . . then the performance of the act or the failure to take such precautions would constitute negligence."   New Jersey Model Jury Instructions (Civil), *Foreseeability (As Affecting Negligence)* § 5.10B (2023).   Since "all remedies available in common-law tort actions are available to a party who prevails under the CEPA," (*Harrington v. Lauer*, 888 F.Supp 616, 621 (D.N.J. 1995) (citing N.J.S.A. 34:19-5)), whether relocation expenses may be covered by common-law tort remedies is an issue that needs to be argued before the Court.   The Court reserves on this issue until it hears the testimony.

### c. Punitive Damages

Defendants contend that Perry is not entitled to recover punitive damages as she fails to meet her burden of proof.   (ECF No. 71 at 34–35).

15

To support an award of punitive damages under CEPA, a plaintiff must prove, "the injury, loss, or harm suffered by plaintiff resulted from defendants' acts or omissions and that either: (1) defendant's conduct was malicious or (2) defendant acted in wanton and willful disregard of plaintiff's rights." New Jersey Model Jury Instructions (Civil), *Punitive Damages - New Jersey Conscientious Employee Protection Act (CEPA) Claims* § 8.63 (2023).  As against an employer defendant, the plaintiff must prove: "(1) the retaliatory action by defendant against plaintiff based on plaintiff's protected activity was "especially egregious"; (2) that at least one of employer defendant's "upper management" employees participated in, or was willfully indifferent to, the wrongful conduct."  *Id.*; *Baker v. Nat'l State Bank*, 161 N.J. 220, 223 (N.J. 1999) (internal citation omitted).

Generally, the "issue of punitive damages is a fact question which should be decided by a jury."  *Domm v. Jersey Printing Co.*, 871 F.Supp. 732, 739 (D.N.J. 1994).  Considering the above-described disputes of fact, the Court denies Defendants' request for summary judgment as to punitive damages.

s/*Peter G. Sheridan*　　　　　
PETER G. SHERIDAN, U.S.D.J.